Nos. 25-3240 and 25-3271
**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

LUCINDA O'DEA ET AL.,
*Plaintiffs-Appellants,*

v.

ALCHEMEE LLC, ET AL.,
*Defendant-Appellee*

---

LUCINDA O'DEA et al.,
*Plaintiffs-Appellants,*

v.

RB HEALTH (US) LLC,
*Defendant-Appellee*

---

Appeal from United States District Court for the Central District of California, Civil Case Nos. 2:24-cv-07048-SB-BFM; 2:24-cv-07049-SB-BFM (Honorable Stanely Blumenfeld, Jr., presiding)

---

**PLAINTIFFS-APPELLANTS'
CONSOLIDATED OPENING BRIEF**

---

Trenton R. Kashima, Esq.
BRYSON HARRIS SUCIU &
DEMAY PLLC
402 W. Broadway, Suite 1760
San Diego, CA 92101
(212) 946-9389
tkashima@brysonpllc.com

Lucy Inman, Esq.
BRYSON HARRIS SUCIU &
DEMAY PLLC
900 W. Morgan Street
Raleigh, NC 27603
(919) 275-2499
linman@brysonpllc.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

PAGE:

TABLE OF CONTENTS ....................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTIONAL STATEMENT ...................................... 6

III.  ISSUES PRESENTED FOR REVIEW ............................... 7

IV.  STATEMENT OF CASE ...................................................... 8

     A.    Applicable FDCA Regulations ................................. 8

     B.    Monograph M006 .................................................. 11

     C.    Federal and International Guidance Regarding Benzene in Pharmaceuticals .................................................. 13

     D.    Appellants' Allegations Regarding the Acne Treatment Products ................................................................. 19

     E.    Procedural History ............................................... 23

     1.    Howard and the January 13, 2025 Motion to Dismiss Order 23

     2.    The April 22, 2025 Motion to Dismiss Order ......................... 25

V.    SUMMARY OF THE ARGUMENT ................................ 27

VI.  STANDARD OF REVIEW ............................................... 29

VII. ARGUMENT ..................................................................... 29

     A.    Appellants' cGMP Claims are not Preempted under 21 U.S.C. § 379r(a) ................................................... 29

1. Appellants' Claims are not Expressly Preempted by the FDCA ................................................................................ 31

    i. Appellants' State Law Claims Parallel Federal cGMP Requirements and are not Preempted .... 33

    ii. Appellants' Reliance on the FDA's 2 ppm Guidance does not Render their Claims Preempted .......................................................... 40

2. Appellants' Claims are not Impliedly Preempted ................. 49

VIII. CONCLUSION ................................................................ 52

STATEMENT OF RELATED CASES ........................................ 54

CERTIFICATE OF COMPLI ACNE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32(a)(7)(C) ............ 55

CERTIFICATE OF FILING AND SERVICE ......................................... 56

# TABLE OF AUTHORITIES

PAGE:

**Cases**

*A.O. Andersen & Co. v. United States*,
284 F. 542 (9th Cir. 1922) .................................................................. 46

*Barnes v. Unilever United States Inc.*,
No. 21 C 6191, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023) .. 35, 36, 37, 40

*Bass v. Stryker Corp.*,
669 F.3d 501 (5th Cir. 2012) ............................................................. 36

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) .......................................................................... 35

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
417 F. Supp. 3d 531 (E.D. Pa. 2019) ............................................ 33, 51

*Bodunde v. Walgreens Boots All., Inc.*,
No. 1:24-CV-00985-JLT-SAB, 2025 WL 1411306 (E.D. Cal. May 15, 2025) ................................................................................................ 37

*Bojko v. Pierre Fabre USA Inc.*,
No. 22 C 6728, 2023 WL 4204663 (N.D. Ill. June 27, 2023) .............. 47

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ...................................................... 47, 48

*California Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987) .......................................................................... 30

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ............................................................. 30

*Corbett v. PharmaCare U.S., Inc.*,
567 F.Supp.3d 1172 (S.D. Cal. 2021) ................................................ 40

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) .............................................................. 29

*Davidson v. Sprout Foods, Inc.*,
   106 F.4th 842 (9th Cir. 2024) ........................................ 31, 49, 50, 51

*Degelmann v. Advanced Med. Optics, Inc.*,
   659 F.3d 835 (9th Cir. 2011) ................................................ 41

*Falk v. Nissan North Am., Inc.*,
   No. 17-cv-04871, 2018 WL 2234303 (N.D. Cal. May 16, 2018) ........... 34

*Gade v. National Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ............................................................. 29

*Gitson v. Trader Joe's Co.*,
   No. 13–cv–01333, 2013 WL 5513711 (N.D. Cal. Oct. 4, 2013) ........... 41

*Gonzalez v. Pepsico, Inc.*,
   489 F. Supp. 2d 1233 (D. Kan. 2007) .................................... 34

*Hendricks v. StarKist Co.*,
   30 F.Supp.3d 917 (N.D. Cal. 2014) ...................................... 30

*Howard v. Alchemee, LLC*,
   No. 2:24-CV-01834-SB, 2024 WL 4272931 (C.D. Cal. Sept. 19, 2024) 24

*Hydranautics v. Filmtec Corp.*,
   70 F.3d 533 (9th Cir. 1995) ................................................ 29

*In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig.*
   *(No. II)*,
   735 F.Supp.3d 352 (S.D.N.Y. 2024) .................................. 36, 41

*Keams v. Tempe Tech. Inst., Inc.*,
   39 F.3d 222 (9th Cir. 1994) ................................................ 31

*Knoppel v. St. Jude Medical, Inc.*,
   No. SACV 13-383, 2013 WL 12116393 (C.D. Cal. Sept. 24, 2013) ...... 36

iv

*Kroessler v. CVS Health Corp.*,
   977 F.3d 803 (9th Cir. 2020)............................................................50

*Lefaivre v. KV Pharm. Co.*,
   636 F.3d 935 (8th Cir. 2011)....................................................36, 52

*McGee v. Johnson & Johnson*,
   684 F.Supp.3d 371 (W.D. Pa. 2023)...................................................36

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)....................................................................30, 31

*Moncibaiz v. Pfizer Inc.*,
   532 F. Supp. 3d 452 (S.D. Tex. 2021) .................................................34

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995).........................................................................30

*Navarro v. Walgreens Boots All., Inc.*,
   No. 1:24-CV-00290-JLT-SAB, 2025 WL 1411406 (E.D. Cal. May 15,
   2025)..............................................................................................36

*Parks School of Business, Inc. v. Symington*,
   51 F.3d 1480 (9th Cir.1995)..............................................................29

*Reese v. Odwalla, Inc.*,
   No. 13-CV-00947-YGR, 2017 WL 565095 (N.D. Cal. Feb. 13, 2017) ..41

*Santoro v. Endologix Inc.*,
   No. 3:19-cv-01679-YY, 2020 WL 6295077 (D. Or. Oct. 6, 2020) .........36

*Smith v. Chrysler Grp., LLC*,
   909 F.3d 744 (5th Cir. 2018).............................................................34

*Stengel v. Medtronic*,
   704 F.3d 1224 (9th Cir.2013).............................................................30

*Toubian v. Boston Scientific Corp.*,
   No. CV 14-2954-JFW, 2014 WL 12607702 (C.D. Cal. Aug. 14, 2014) 36

v

*Underwood v. O'Reilly Auto Parts, Inc.,*
   699 F. Supp. 3d 1049 (D. Nev. 2023) ....................................................34

*United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, an*
   *Article of Device,*
   799 F. Supp. 1275 (D.P.R. 1992) ...........................................................38

*United States v. Cassaro, Inc.,*
   443 F.2d 153 (1st Cir. 1971) ................................................................38

*Williams v. Galderma Lab'ys, L.P.,*
   No. 24-CV-2222, 2024 WL 4213220 (N.D. Ill. Sept. 17, 2024)............36

*Wyler Summit P'ship v. Turner Broadcasting Sys.,*
   135 F.3d 658 (9th Cir. 1998) ................................................................29

## Statutes

21 U.S.C § 321 ...........................................................................................18

21 U.S.C. § 321 ...................................................................................42, 43

21 U.S.C. § 331 ................................................................................. passim

21 U.S.C. § 343-1 ......................................................................................49

21 U.S.C. § 351 ................................................................................. passim

28 U.S.C. § 1291 .........................................................................................7

28 U.S.C. § 1332 .........................................................................................7

410 Ill. Comp. Stat. 620/14.................................................................11, 35

Cal. Health & Safety Code § 111260................................................10, 35

UCC § 2-314.........................................................................................33, 35

## Regulations

21 C.F.R. § 211.137 ......................................................... 10, 19, 27, 39

21 C.F.R. § 211.160 .................................................................... 10, 21, 27, 39

21 C.F.R. § 211.165 ...................................................................... passim

21 C.F.R. § 211.166 ...................................................................... passim

21 C.F.R. § 211.42 ..................................................................... 10, 21, 27, 39

21 C.F.R. § 211.84 ........................................................................ passim

21 C.F.R. § 311 ............................................................................... 10

21 C.F.R. § 330.1 ..................................................................... 8, 32, 33

## Treatises

3 Anderson U.C.C. § 2-314:77, Content of implied warranty of
merchantability — Safety (3d. ed.)..................................................34

## Other Authorities

Martin Blake, *The Role of the Compendia in Establishing Drug
Standards*, 31 Food Drug Cosm. L.J. 276, 276 (1976) ........................ 42

Monograph M006: Topical Acne Drug Products for Over-the-Counter
Human Use ............................................................................ 11

Plaintiffs-Appellants[1] in both *O'Dea, et al.* v. *Alchemee, LLC & Taro Pharmaceutical USA, Inc.*, No. 25-3271 (the "*Alchemee* Action"), and *O'Dea & Heermann v. RB Health (US), LLC*, No. 25-3271, No. 25-3240 (the "*RB Health* Action"), respectfully submit this Opening Brief. These matters have been consolidated for the purposes of briefing and oral argument. *See* Docket Entry No. 14.1 in No. 25-3240.

## I.  INTRODUCTION

At its core, this appeal turns on whether states can enforce their own law to protect the health and safety of their citizens–an authority squarely within a state's powers. The District Court held that Appellants' state law claims were preempted by the Food, Drug, and Cosmetic Act ("FDCA"), concluding that consumers injured by negligently manufactured drugs, resulting in the products becoming contaminated with benzene, had no recourse. This was error. The FDCA allows states to impose their own pharmaceutical related regulations, so

---

[1] Lucinda O'Dea, George Teron, Efren Ramos, Joshua Cross, Marisol Scharon, Jamie Heermann, Bianca Jackson, Cole Scroggs, and Jordan Judt are the Plaintiffs-Appellants in the *Alchemee* Action and Lucinda O'Dea and Jamie Heermann are the Plaintiffs-Appellants in the *RB Health* Action. Collectively, these individuals are referred to as the "Appellants" herein.

long as they are identical to those arising out of federal requirements. *See* 21 U.S.C. § 379r(a). Here, Appellants allege state law claims do not impose duties additional or different than those required by federal law; they *directly* mirror it, namely, the current Good Manufacturing Practices regulations ("cGMP" regulations or "cGMPs"). Thus, Appellants' claims are expressly permitted by the FDCA's own language. There is no preemption.

Indeed, Appellants' claims are in lockstep with federal law. Federal (as well as international) standards recognize benzene's unacceptable toxicity and permit its presence in drugs only if "unavoidable in order to produce a drug product with a significant therapeutic advance." ER-476-82, 773-78. And in these limited circumstances, only an exceedingly small amount of benzene is permissible, 2 ppm. *Ibid.* Food and Drug Administration ("FDA") guidance affirms that "[m]anufacturers should not use benzene in the manufacture of drugs" and that "[d]rug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm." ER-480, 776; *see also* ER-695-96.

Defendants-Appellees, Alchemee, LLC and Taro Pharmaceutical

2

USA, Inc., manufacture, market, and distribute over-the-counter ("OTC") "*Proactiv*" branded acne treatment drugs, and likewise, Defendant-Appellee RB Health (US), LLC[2] does the same for OTC "*Clearasil*" branded acne treatments (collectively, with *Proactiv* products, "Acne Treatment Products").[3] The Acne Treatment Products contain the active ingredient benzoyl peroxide ("BPO") and are marketed as safe, effective, and legal topical treatments of acne. However, the Acne Treatment Products' active ingredient BPO degrades into unsafe levels of benzene, a well-known human carcinogen linked to leukemia and other cancers. ER-474-82, 770-78.

---

[2] Defendants-Appellees Alchemee, LLC, Taro Pharmaceutical USA, Inc. RB Health (US), LLC are collectively referred to the "Appellees" herein.

[3] As both of these cases alleged similar claims, based on similar legal theories, and were filed during similar time periods,[3], the United States District Court for the Central District Of California, Judge Stanely Blumenfeld, Jr. presiding, informally consolidated the *Alchemee* and *RB Health* Actions, hearing the dispositive motions in both cases at the same time, and resolving these matters in the a single combined written decision. Excerpt of the Record ("ER") at 005. The operative Second Amended Complaint was filed in both the *Alchemee* and *RB Health* Action on the same day. ER-763, 461. The *Alchemee* and *RB Health* Second Amended Complaints will be referred to as the "Complaints" herein. For the sake of brevity, Appellants will address these Complaints, resulting Motions to Dismiss, and the District Court's written decision in the collective.

The benzene contamination in the Acne Treatment Products results from the accelerated degradation of BPO when improperly stored and manufactured at high temperatures. ER-482-86, 491-97, 778-82, 786-92. Appellants cite independent, third-party stability and off-the-shelf testing, as well as Appellants' own testing, all of which found the Acne Treatment Products contain a concerning amount of benzene. ER-486-88, 782-84. Stability testing shows that over the Products' shelf-life, benzene levels would exceed the 2 ppm limit by more than a hundredfold. *Ibid.* Accordingly, the Acne Treatment Products are adulterated.

The Appellees' production of Acne Treatment Products are alleged to have violated federal (and corresponding state) laws requiring adherence to minimum quality control standards in manufacturing OTC drugs. These minimum cGMPs standards were established by the FDA pursuant to the FDCA and its subsequent amendments. The cGMPs require, among other things, stability testing, quality and purity testing, adequate environmental controls, and to reject any product that is impure or does not meet the standards. Appellants allege that Appellees' failed to conduct the cGMP-required testing, and further failed to maintain proper environmental controls, was the cause of the benzene

4

contamination in the Acne Treatment Products. ER-491-97, 786-92. Had these requirements been followed, the adulterated Products would have never reached consumers.

Appellants' claims all arise from familiar state causes of action: breach of implied warranty of merchantability, violations of various consumer protection statutes,[4] negligent misrepresentation/omission, and unjust enrichment. These two appeals raise one controlling question: whether consumers can pursue state-law remedies when an OTC acne treatment contains dangerous levels of benzene due to poor manufacturing practices.

The relevant preemption clause of the FDCA, 21 U.S.C. § 379r(a), readily provides the answer. It expressly provides that states can adopt legal requirements that are not "different from or in addition to, or … otherwise [ ] identical with, a requirement under the [FDCA]." *Id.* Such defective product cases have long been the domain of state law, which

---

[4] The *RB Health* Complaint alleges claims for violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") and the Missouri Merchandising Practices Act ("MMPA"). The *Alchemee* Complaint alleges claims for violations of the ICFA; California's Consumer Legal Remedies Act; California's Unfair Competition Law; the MMPA; and the Nebraska Consumer Protection Act.

provides various parallel consumer protections, and Appellants' claims fall squarely within this category.

Appellants' state law causes of action allege that Appellees failed to comply with legal duties parallel to those imposed by the FDCA. FDCA prohibits the sale of adulterated drugs, including those not manufactured in compliance with the cGMPs, drugs that contain a "decomposed substance," or drugs that fall below established standards of purity or quality. 21 U.S.C. §§ 331(a), 351(a), (c), (h). State statutes incorporating the same safety standards as the FDCA make these violations subject to civil actions independent of, but not in conflict with, federal standards. Because Appellants seek to hold Appellees to state safety standards which parallel federal requirements, their claims are not preempted. To hold otherwise would strip states of their traditional power to protect consumers from unsafe products and would leave the public defenseless against adulterated drugs unless and until the FDA alone chose to act.

## II.  JURISDICTIONAL STATEMENT

Appellants litigated their respective putative class actions in the Central District of California. ER-575-96, 847-64. The Complaints alleged claims on behalf of classes of individuals who purchased the products in California, Nebraska, Illinois, and Missouri. ER-498-99, 793.

6

Appellee RB Health (US) LLC is a Delaware corporation with its headquarters located in Parsippany, New Jersey. ER-767. Appellee Alchemee LLC is Delaware limited liability company and Appelle Taro Pharmaceuticals U.S.A., Inc. is a New York corporation. ER-471. Both entities have their principal place of business in Hawthorne, New York. *Ibid.* The District Court had jurisdiction over the action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

On April 22, 2025, the District Court entered an order granting Appellees' respective motions to dismiss. ER-004-015. That same date, the District Court entered judgment in both the *Alchemee* and *RB Health* Actions, disposing of the actions in their entirety. ER-002-03. On May 20, 2025, within 30 days of the District Court's entry of judgment, Appellants filed their Notice of Appeal in both cases. ER-595, 864.

This Court has jurisdiction pursuant 28 U.S.C. § 1291.

## III. ISSUES PRESENTED FOR REVIEW

Did the District Court err in concluding that the FDCA, specifically 21 U.S.C. § 379r(a), expressly preempts state law claims that seek to enforce duties identical to cGMP requirements, where Appellants allege the Acne Treatment Products were contaminated with excessive levels of benzene?

7

## IV. STATEMENT OF CASE

While the underlying facts in this case are relatively straightforward, some brief background information is helpful in understanding the legal claims at issue.

### A. **Applicable FDCA Regulations**

It is not disputed that Appellees' Acne Treatment Products are OTC drugs, governed by an FDA OTC "monograph" and the general safety provisions of 21 C.F.R. § 330.1.

The FDA regulates OTC drugs, in part, through the monograph process, detailed regulations that establish "conditions under which OTC (over-the-counter) drugs are generally recognized as safe and effective and not misbranded." *See* 21 C.F.R. § 330.10 (describing process for establishing monographs). Among other things, an OTC monograph specifies the permissible active ingredients, indications for use, dosing instructions, and other mandatory labeling requirements. *Id.* Put differently, an OTC monograph approves which active ingredients can be used for a given therapeutic class of OTC drugs and sets forth the conditions under which each active ingredient is safe and effective. *Id.*

An OTC monograph, however, does not completely displace other FDCA drug regulations. Section 330.1 specifically provided that OTC

8

drugs, even those subject to a monograph, must be "manufactured in compliance with current good manufacturing practices;" that the "product is labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act;" and that the "product contains only suitable inactive ingredients which are safe[,] . . . and do not interfere with the effectiveness of the preparation or with suitable tests or assays to determine if the product meets its professed standards of identity, strength, quality, and purity." 21 C.F.R. § 330.1(a), (c)(1), (e).

Nor does compliance with the relevant monograph absolve a manufacturer for liability under 21 U.S.C. § 331(a), which prohibits the introduction or delivery of an adulterated drug into the market. Thus, manufacturers are still prohibited from selling or distributing an OTC drug that "consists in whole or in part of any filthy, putrid, or decomposed substance"; "its purity or quality falls below, that which it purports or is represented to possess"; or fails to comply with the relevant cGMP standards. 21 U.S.C. § 351(a), (c). Thus, when Monograph M006 does not repeat the cGMP provisions, it is because § 330.1 incorporates them by reference.

Here, the relevant cGMP standards are set forth in 21 C.F.R. §§

211, *et seq.* Among other things, the cGMP regulations require:

- that the manufacture, processing, packing, or holding of a drug product be conducted in the appropriate facilities and operating conditions, which includes "[t]emperature and humidity controls" and "system[s] for monitoring environmental conditions" (21 C.F.R. § 211.42);

- Appropriate testing of the raw materials used in, and finished batches of, drug products to ensure conformity with all appropriate written specifications for purity, strength, and quality (21 C.F.R. §§ 211.84, 211.160, 211.165);

- Rejection of any product or component that does not meet the appropriate written specifications of identity, strength, quality, and purity and related tests (21 C.F.R. § 211.84); and

- Appropriate stability testing to ensure the appropriate storage conditions and expiration dates for the drug product (21 C.F.R. § 211.166; *see also* 21 C.F.R. § 211.137).

Both California and Illinois specifically adopt these cGMP regulations into their own state laws. The California Health and Safety Code, section 111260, expressly provides that violations of the cGMP renders any drug

"adulterated." Similarly, the Illinois Food, Drug and Cosmetic Act contains the same definition of "adulterated" as its federal counterpart, expressly providing that failure to manufacture or hold a drug in compliance with cGMP regulations renders the drug adulterated. *Compare* 410 Ill. Comp. Stat. 620/14(a)(1) *with* 21 U.S.C. § 351(a)(1).

### B. <u>Monograph M006</u>

The OTC monograph at issue is Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use (Posted November 23, 2021). *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/ omuf/OTC%20Monograph_M006-Topical%20Acne%20drug%20products %20for%20OTC%20Human%20Use%2011.23.2021.pdf (last visited on Sept. 2, 2025). Monograph M006 provides that BPO, in concentrations of 2.5 to 10 percent, may be used in "management" or "treatment of acne," provided that the product bears the required label warnings and directions. While the Monograph does not repeat verbatim the cGMP requirements nor the universe of potential adulterants and warnings, this does not let manufacturers off the hook, as the Monograph *expressly* incorporates the general drug labeling and safety provisions of the FDCA.

By its terms, Monograph M006 specifically notes that any products manufactured subject to its provisions must also comply with "general

11

condition established in 21 CFR 330.1." *Id.* Section 330.1 in turn requires that all OTC drugs be: (a) manufactured in compliance with cGMPs (21 C.F.R. § 330.1(a)); (c) labeled in compliance with the FDCA's general labeling provisions (21 C.F.R. § 330.1(c)(1)); and (e) formulated only with suitable inactive ingredients that are safe and do not interfere with effectiveness or testing 21 C.F.R. (§ 330.1(e)). In other words, the Monograph recognizes that manufacturers must ensure that their BPO OTC acne treatments are manufactured according to cGMP and are not adulterated in a manner that would affect the identity, strength, quality, and purity of the product.

In short, while Monograph M006 authorizes BPO as an acne treatment active ingredient, it does not excuse manufacturers from the baseline obligations of cGMP compliance, accurate labeling, and purity standards. Those requirements continue to apply with full force, and failure to meet them renders an OTC acne treatment adulterated and unlawful.

C.  **Federal and International Guidance Regarding Benzene in Pharmaceuticals**

As alleged in the relevant operative Complaints[5], benzene is a long-recognized human carcinogen.  ER-474-82, 770-78.  Appellants specifically allege that the FDA, the World Health Organization, the Centers for Disease Control, the National Cancer Institute, the International Agency for Research on Cancer, and the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use ("ICH"), as well as independent researchers, have found that exposure to benzene is associated with serious health conditions, such as anemia, leukemia, and other blood disorders.  *Ibid*.  Scientists agree that benzene, even in small amounts, is harmful.  *Ibid*.  No one seriously disputes the toxicity of benzene.

Based on the broad scientific consensus, as embodied in both federal and international guidelines, pharmaceuticals should not contain benzene unless it is unavoidable, and even in such circumstances, benzene levels should be limited to 2 ppm.  ER-474-82, 770-78.  This is

---

[5] As the Court below noted in its Motion to Dismiss decision, the allegations at issue here are similar for both the *Alchemee* and *RB Health* Actions.  ER-005.  Accordingly, Appellants will address the allegations in these two Actions together, as the District Court did.

due to the serious health risk associated with human exposure to benzene, which is known to cause "a range of acute and long-term adverse health effects and diseases, including cancer and hematological effects." *Ibid.* For example, the WHO found that "[b]enzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended." ER-475, 771.

Indeed, the FDA, in its December 2023 notice—"FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs" (the "Alert")—specifically stated that:

> Benzene is a known human carcinogen that causes leukemia and other blood disorders. Certain drug products, including hand sanitizers, *benzoyl peroxide products*, and aerosol drug products have been recalled due to benzene contamination. As discussed in further detail below, this contamination may be related to inactive ingredients, such as carbomers (thickening agents), isobutane (a spray propellant), or other drug components made from hydrocarbons, *or to degradation of certain active ingredients in drug products*.

ER-695-698 (emphasis added) (this document was also cited in the Complaints, *see, e.g.,* ER-014, 480, 776). The FDA has specifically recognized both the risk of benzene resulting from BPO, as well as the potential for the type of degradation that could lead to benzene contamination in BPO products.

14

The 2023 Alert further provided:

Manufacturers should not use benzene in the manufacture of drugs. _The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance [link to document]) and companion document Q3C Tables and List [link to document]) provide guidance on limited cases where the presence of benzene may be tolerated_. Specifically, the ICH Q3C guidance explains that Class 1 solvents such as benzene should not be employed in the manufacture of drug substances, excipients, or drug products because of their unacceptable toxicity. The guidance notes that if benzene use is unavoidable to produce a drug product with a significant therapeutic adv Acne, then its levels should be restricted to 2 parts per million (ppm), unless otherwise justified.

\* \* \*

_Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm, consistent with the recommendations described in the ICH Q3C guidance_.

_Ibid._ (emphasis added).

The Alert further stated that benzene contamination can and should be controlled through the appropriate cGMPs:

FDA reminds drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 CFR 211.84 ([link to regulation]), 21 CFR 211.160 ([link to regulation])). _This includes testing of raw materials and finished product batches_ (21 CFR 211.165 ([link to regulation])) prior to release to

ensure they meet appropriate specifications for identity, strength, quality, and purity.

* * *

FDA is also aware of ingredients, such as the antifungal preservative sodium benzoate, that in combination with chemicals, such as antioxidants in a drug formulation, may yield benzene under certain conditions. *The formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing*, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137).

*Ibid.* (emphasis added).

The FDA's adoption of the ICH's guidance in its "Q3C Tables and List" is not surprising. The FDA is a "founding member" of the ICH, and "implements all ICH Guidelines as FDA Guidance" and "encourages implementation of ICH Guidelines by pharmaceutical regulatory authorities globally." FDA, International Regulatory Harmonization, available at https://www.fda.gov/drugs/cder-international-program/international-regulatory-harmonization (last visited on Sept. 3, 2025). However, while admittedly not binding, the Q3C Tables and List "represents the current thinking of the [FDA] on this topic." ER-686, 013 (the Q3C Guidance was cited in the Complaints, ER-476-77, 773).

16

Accordingly, both federal and international guidelines are in lockstep, benzene should not be used in the manufacture of pharmaceuticals, and if it is unavoidable, should be limited to 2 ppm. Additionally, the FDA has made it clear that appropriate controls to prevent benzene contamination are a requirement under binding cGMP regulations.

Indeed, the FDA has been consistent in its application of the benzene limits contained within the Q3C Tables and List regarding topical OTC drugs. For example, the FDA cited this Q3C Tables and List in analyzing the risk in other OTC drugs. In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson. ER-477-80, 773-76 (citing Center for Drug Evaluation and Research, Health Hazard Evaluation, July 8, 2021, available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images2021/Health/12Dec/FDA_Bezene_in_Sunscreen_Assessment (last visited Sept. 3, 2025). Similarly, on April 18, 2018, the FDA issued a Health Hazard Evaluation for two over-the-counter topical pain relievers containing benzene. *Ibid*. Both of these evaluations were triggered by testing that found benzene in these OTC drugs at concentrations

17

exceeding the 2 ppm limit provided in the 3C Tables and List. *Ibid.*

The Johnson & Johnson Health Hazard Evaluation also noted that the "United States Pharmacopeia ("USP") Residual Solvent limits the concentration of benzene to not more than 2 parts per million." ER-478-79, 774-75 (citing CDER Health Hazard Evaluation, July 8, 2021). This is significant because the FDCA expressly recognizes USP quality standards for medicines and finds that failure to abide by the USP would render a drug adulterated. 21 U.S.C §§ 321(j) (the USP is a "official compendium" under the FDCA), 351(b) (a drug is adulterated if "it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium."). In short, even the FDA recognizes benzene may not be in drug products for reasons that extend beyond the Q3C Tables and List.

In sum, federal law prohibits the indiscriminate use of benzene in pharmaceuticals, establishes a hard limit of 2 ppm of benzene in any drug product, and requires quality control steps to prevent benzene contamination.

**D.** <u>**Appellants' Allegations Regarding the Acne Treatment Products**</u>

Appellants alleged that the Acne Treatment Products, manufactured and distributed by the Appellees, "contain[ed] benzene at levels that vastly exceed those determined by the FDA to represent a serious health hazard which may be life-threatening." ER-480, 776. Stability testing conducted by Valisure LLC (which was submitted to the FDA as part of a citizen's petition) found the Acne Treatment Products to have benzene levels in the hundreds, if not thousands, of parts per million (well above the 2 ppm FDA, ICH, and USP guidance) (well above the 2 ppm FDA, ICH, and USP guidance) when exposed to elevated temperatures (between 98.6°F and 158°F) commonly associated with the transport and storage of consumer products. ER-486-88, 782-84. More specifically, the Valisure stability testing found benzene levels of <u>*over 1700 ppm*</u> for the Proactiv 2.5% BPO Cream and <u>*over 400 ppm*</u> for Proactiv's 5.0% BPO Cream and <u>*over 308 ppm*</u> of the Clearasil 10% BPO cream. ER-487-88, 784. Obviously, if the FDA, ICH, and USP consider 2 ppm of benzene to be problematic, then exceeding this limit by a factor of a hundred, or more, is hazardous.

Stability testing is required by cGMP regulations is important

because it is used to determine expected storage conditions and shelf-life of drugs. ER-487, 783; 21 C.F.R. § 211.166; *see also* 21 C.F.R. § 211.137. As Appellants allege, researchers use the metric 43 days at 70°C (158°F) as the 3-year accelerated stability equivalent. ER-487, 783. "This means that to achieve the expected minimum shelf life of 3 years for a standard pharmaceutical product, the product should exhibit stability for at least 43 days of 70°C incubation." *Id.* Here, the Acne Treatment Products have not maintained that stability and instead develop dangerous amounts of benzene well within their normal shelf life. *Ibid.*

Further testing also found that the Acne Treatment Products were adulterated at the time of sale. A follow-on study (by the same authors of the Valisure petition) found that even when taken directly from the shelf and tested, certain Clearasil and Proactiv Products exceed the 2 ppm limit for Benzene. ER-488, 784. Based on these findings, Plaintiffs allege that the Acne Treatment Products have unacceptable levels of benzene both at the time of purchase and during their normal shelf life.

Appellants specifically allege that the benzene in the Acne Treatment Products results from premature degradation of BPO:

> [b]enzene is created in [Appellants'] Products, because BPO
> has a known, inherent propensity to thermally decompose

into two molecules of benzoic acid radicals that further decompose to benzene radicals with liberation of carbon dioxide The benzene radicals then produce benze[ne]. [¶] This process is accelerated by exposure to elevated temperatures equivalent to the temperature of hot cars/trucks/shipping containers or in improperly regulated manufacturing facilities.

ER-482-84, 494-95, 778-80, 789-91. Given the known mechanism of BPO degradation— exposure to elevated temperatures[6]—Appellants allege that Appellees' failure to follow cGMP resulted in the benzene contamination. Indeed, Appellants alleged that Appellees' failure to keep manufacturing processes and finished products within acceptable temperatures resulted in the BPO contained within the Acne Treatment Products degrading into benzene so quickly and significantly (at least when compared to its competitors). ER-494-95, 789-91; 21 C.F.R. § 211.42. Plaintiffs further allege that had Appellees employed appropriate testing procedures, for both raw materials and finish batches, they would have found any benzene contamination, and such products would not have been allowed on the shelves "and certainly should not have sold them to customers." ER-493-94, 789-90; 21 C.F.R.

---

[6] The Complaints specifically note that "benzene contamination is reduced, or even halted, when BPO is kept at lower temperatures." ER-484, 780.

§§ 211.84, 211.160, 211.165. Finally, Appellants allege Appellees' stability testing was deficient, as it did not detect that the Acne Treatment Products would develop unacceptable levels of benzene during their normal shelf-life. ER-495, 790-91; 21 C.F.R. § 211.166. It was these compounding and systematic violations cGMP that Appellants allege led to the benzene contamination found in the Valisure testing.

Appellants do not allege that all BPO based acne treatments are defective because they inherently contain benzene. ER-483-84, 779-80. Indeed, studies show the opposite. *Ibid.* The operative Complaints notes that a 2024 study entitled "Evaluation of Benzene Presence and Formation in Benzoyl Peroxide Drug Products," in the Journal of Investigative Dermatology, tested 111 OTC BPO acne treatments, finding that only "only 38 products, representing 34% of products tested, contained benzene above the conditionally restricted FDA limit of 2 ppm for benzene for drug product." *Ibid.* It is apparent that "some brands are able to either formulate their BPO-based acne treatments or adopt proper manufacturing controls, to ensure that the BPO does not degrade into benzene during the manufacturing or holding process." *Ibid.* Thus, Appellants allege that it is Appellees' negligent manufacturing processes,

not the inherent instability of BPO, which causes the benzene contamination.

Based on these allegations, Appellants allege violations of various state consumer protection laws. To the extent that Appellants' claims are based on misrepresentation or omission, Appellants allege that Appellees, by placing the Products on the market as an OTC drug, represented that the Acne Treatment Products could be legally sold as OTC drugs and complied with the relevant cGMP regulations. *See*, *e.g.*, ER-472-73, 497-98, 768-69, 792-93. Similarly, to the extent that Appellants' claims are based on unlawful/unfair conduct, or on the implied warranty of merchantability, Appellants allege that the Acne Treatment Products contain benzene, including at levels that exceed the FDA's and ICH's guidelines and that the Products were not manufactured and held in accordance with cGMP standards, rendering them adulterated and unable to be legally sold. *See, e.g.*, ER-497-98, 792-93.

### E.  **Procedural History**

#### 1.  *Howard and the January 13, 2025 Motion to Dismiss Order*

These cases have a winding history. Several actions were filed

regarding benzene contamination in BPO-based acne OTC medicines, including the Acne Treatment Products. Several cases, including these two, were transferred to be heard before the Honorable Stanley Blumenfeld, Jr. in the Central District of California. Motions to dismiss in three of these actions, *Howard v. Alchemee, LLC*, No. 2:24-cv-01834-SB, *Montenegro v. CVS Pharmacy, Inc.*, No. 2:24-CV-01876-SB, and *Montenegro v. RB Health US LLC*, No. 2:24-CV-01878-SB, lead to the *Howard* opinion, which dismissed the plaintiffs' omission-based theory of liability and led to a judgment in defendants' favor. *Howard v. Alchemee, LLC*, No. 2:24-CV-01834-SB, 2024 WL 4272931 (C.D. Cal. Sept. 19, 2024). In *Howard*, the District Court held that Plaintiffs' omission claims were preempted under the FDCA, as it would require the defendants to disclose the presence of benzene, a requirement that exceeds the express labeling requirements established in the FDCA and resulting regulations, such as Monograph M006. *See Howard*, 2024 WL 4272931 at *6-10. An appeal of the *Howard* opinion is currently pending before the Ninth Circuit (*see* Case No. 24-6684).[7]

---

[7] As recognized by the District Court, while some of these claims remained in the Complaints, they were only to reserve the issue for

These two cases take a different tact. Instead of alleging an omission-based claim, the Appellants' cause of action focuses on the cGMP violations that led to the benzene contamination in BPO. Following *Howard*, the Appellants agreed to voluntarily consolidate their complaints, combining the remaining actions into two cases against the respective defendants, the *Alchemee* and *RB Health* Actions. Appellees would move to dismiss in the *Alchemee* and *RB Health* Actions and the District Court heard the relevant motions together, issuing a single order addressing the claims in both cases.

In a January 13, 2025 Order, the District Court granted the motions to dismiss, concluding that Plaintiffs had failed to provide sufficient notice of the factual basis for cGMP violations at issue. This would lead to the filing of the Second Amended Consolidated Complaints in both the *Alchemee* and *RB Health* Actions.

### 2. *The April 22, 2025 Motion to Dismiss Order*

The filing of the Second Amended Consolidated Complaints

_____

appeal. ER-014. To the extent that this Court finds the *Howard* Appellants' arguments persuasive, Appellants in this appeal adopts the opinion therein.

triggered another round of motions to dismiss by the relevant defendants in the *Alchemee* and *RB Health* Actions. The District Court, again, heard this second round of motions together and issued a single order dismissing both cases. ER-005.[8]

After disposing of standing arguments that are not at issue in this appeal, the District Court held that Appellants' cGMP based claims in both *Alchemee* and *RB Health* Actions were preempted by the FDCA. ER-012-015. More specifically, the District Court held that "[a]bsent such a federal limit [on the level of benzene in OTC drugs], Plaintiffs' claims are expressly preempted because they impose a requirement that is in addition to and not identical to the FDCA." ER-012. The District Court reasoned that although the FDA had established a 2 ppm limit for benzene in the 3C Tables and List, it was not binding and "does not impose a legal limit on the benzene in Defendants' products." ER-013. The District Court further held that Appellants could not rely on the general definition of adulteration in 21 U.S.C. § 351(a), which encompasses products "[consisting] in whole or in part of any filthy,

---

[8] The District Court's opinion refers to the record in *Alchemee* Action unless otherwise noted.

putrid, or decomposed substance." ER-014. Accordingly, the District Court entered judgment in favor of Defendants in both the *Alchemee* and *RB Health* Actions. Plaintiffs timely appealed

## V.   SUMMARY OF THE ARGUMENT

Appellants' cGMP claims are not preempted under the plain language of the relevant preemption clause of the FDCA, 21 U.S.C. § 379r(a), because they do not seek to apply requirements which depart from those contained in the FDCA and related FDA regulations and guidance. The District Court erred in holding otherwise.

First, the District Court's express preemption analysis improperly focused on the binding nature of 2 ppm benzene limit contained in the FDA's Q3C Tables and List. This 2 ppm benzene limit does not resolve Appellants' cGMP claims. The cGMP requires that Appellee adopt the appropriate environmental/temperature controls (21 C.F.R. § 211.42), component and finished product testing (21 C.F.R. §§ 211.84, 211.160, 211.165), and stability testing (21 C.F.R. § 211.166; *see also* 21 C.F.R. § 211.137). Even absent a finding of benzene contamination, allegations that Appellees failed to comply with these cGMP requirements renders the Acne Treatment Products adulterated under federal law, and under parallel state law standards. 21 U.S.C. §§ 331(a), 351(a)(1). A state law

cause of action which seeks to hold Appellees to the duties established under cGMP regulations are not preempted under the FDCA, because the parallel federal requirements.

Second, even if 2 ppm benzene limit contained in the FDA's Q3C Tables and List were material, it would not alter the Court's conclusion. The FDCA generally prohibits "decomposed substance" in drug products, as well as products that do not meet standards established in the USP. 21 U.S.C. § 351(a), (b). FDA guidelines (embodied in the Q3C Tables and List), international guidelines (embodied in the ICH guidance), and the USP (at Chapter 467) all confirm that benzene should not be in the Acne Treatment Products unless absolutely necessary. But, even if necessary, benzene in the Acne Treatment Products may not exceed 2 ppm. Allegations that the Acne Treatment Products contain benzene exceeding 2 ppm during their shelf life do not seek to hold Appellees to any standard that would differ from the requirements of the FDCA. So these claims are not preempted.

Finally, given that Appellants seek to enforce state laws which mirror the FDCA, as specifically allowed under the 21 U.S.C. § 379r(a), for claims that sound in traditional state consumer protection claims,

Appellants' cGMP claims are not impliedly preempted.

## VI.   STANDARD OF REVIEW

An appellate court reviews an order granting a motion to dismiss for failure to state a claim *de novo*.  *Wyler Summit P'ship v. Turner Broadcasting Sys.*, 135 F.3d 658, 661 (9th Cir. 1998).  On a motion to dismiss, all well-pleaded allegations are taken as true and all reasonable inferences arising from the allegations must be construed in favor of the plaintiff.  *See Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995).  Under Rule 12(b)(6), a complaint "should not be dismissed unless it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 535–36 (9th Cir. 1995).

## VII.   ARGUMENT

### A.   <u>Appellants' cGMP Claims are not Preempted under 21 U.S.C. § 379r(a)</u>

The Supremacy Clause of the United States Constitution grants Congress the power to preempt state law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Preemption of state law by federal statutes "may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or

implicitly contained in its structure and purpose.'" *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citation omitted). "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010). To determine whether state claims are preempted by federal law, the Court must ascertain the intent of Congress. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

The party asserting preemption bears the burden of overcoming the strong threshold presumption that Congress did not intend to preempt state law. *Hendricks v. StarKist Co.*, 30 F.Supp.3d 917, 925 (N.D. Cal. 2014) *citing Stengel v. Medtronic*, 704 F.3d 1224, 1227–28 (9th Cir.2013) (en banc). This presumption against preemption is particularly strong in fields traditionally regulated by states, like health and safety. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *see also*, *e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

1.  *Appellants' Claims are not Expressly Preempted by the FDCA*

The District Court concluded that the FDCA expressly preempts Plaintiffs' claims. ER-012-15. That was error.

This Court has long recognized that when Congress expressly provides for parallel state regulation, such as in FDC, it did not intend to "preempt state law generally, or in respects other than those it addressed." *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994).[9] The preemption clause relevant to these cases provides that federal law <u>only</u> preempts states from enforcing laws that are "different from or in addition to, or that [are] otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r(a). This statutory language reflects that Congress specifically provided a limited space for states to provide private causes of action, so long as they do not exceed, or differ from, federal requirements. *See Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 849 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1922 (2025).

---

[9] Thus, it was not the intent of Congress for the FDCA to occupy the entire field, displacing state law entirely. *Keams*, 39 F.3d at 225 ("It is apparent from the language of the express preemption clauses that Congress expected state law to operate in much of the field in which it was legislating. Thus, there can be no inference that Congress left no room for supplementary state regulation.") (internal quotations omitted).

Thus, a state law claim is not preempted if it parallels federal law. *See Medtronic, Inc.*, 518 U.S. at 495.

None of Appellants' claims here seek to impose state-level requirements that exceed their federal counterparts, so none of their claims are preempted. On the contrary, Appellants' claims are rooted in Defendants' misbranding and adulteration of Acne Treatment Products as defined by the FDCA and related cGMP regulations. Appellants' respective Complaints fundamentally allege that Appellees failed to comply with minimum federal pharmaceutical manufacturing standards (*i.e.*, the cGMPs) incorporated by California and Illinois statutes. This failure alone would cause the Acne Treatment Products drug to be adulterated and illegal to sell. 21 U.S.C. § 351(a)(1); 21 C.F.R. § 330.1(a). Yet, Appellees did not merely violate technical federal standards. Appellees' alleged lapse allowed the Acne Treatment Products to become adulterated with benzene in amounts that significantly exceed FDA's 2 ppm benzene limit during the shelf life of the Products. These failures formed the basis of Appellants' state law cases of action.

Nonetheless, the District Court held that Appellants' claims were preempted, because they relied on non-binding FDA guidelines (*i.e.*, the

2 ppm limit in found in the Q3C Tables and List) regarding the amount of benzene which can be contained in the drug products, such as the Acne Treatment Products. ER-013. This conclusion misapplied the law.

        i.        <u>Appellants' State Law Claims Parallel Federal cGMP Requirements and are not Preempted</u>

Appellants' claims were based on cGMP violations, not solely on the benzene contamination. ER-491-498, 785-792. noted above, the FDCA provides that any drug (including those subject to an OTC Monograph) not produced in conformity with cGMP is adulterated and cannot be sold. 21 U.S.C. §§ 331(a), 351(a)(1); 21 C.F.R. § 330.1(a). And such violations can be the basis for traditional state law claims. For example, courts have held that claims that a drug is manufactured in a manner that was materially non-compliant with cGMPs could give rise to a claim for breach of the implied warranty of merchantability under the Uniform Commercial Code ("UCC") in the same manner as any other manufacturing defect claim. *See, e.g., Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC,* 417 F. Supp. 3d 531, 567 (E.D. Pa. 2019); UCC § 2-314(2)(a), (c) (under the UCC, as adopted by the relevant states, goods must, *inter alia*, "pass without objection in the trade under the contract description" and "are fit for the ordinary purposes for which such goods

are used."). This is unsurprising as failing to produce a product to minimum applicable safety standards is an important consideration when determining whether a product is of merchantable quality. *Blue Cross Blue Shield Ass'n, surpa* ("Given that Plaintiffs' claims here are most analogous to a manufacturing defect claim, i.e., GSK breached the implied warranty of merchantability that came with the At-Issue Drugs because they were materially non-compliant with cGMPs, … summary judgment will be denied as to Plaintiffs' breach of implied warranty claim"); *Underwood v. O'Reilly Auto Parts, Inc.*, 699 F. Supp. 3d 1049, 1062 (D. Nev. 2023) ("Courts and legal treatises have recognized that the implied warranty of merchantability embraces a minimum level of safety.").[10] Furthermore, failure to comply with cGMP regulations

---

[10] *Citing Moncibaiz v. Pfizer Inc.*, 532 F. Supp. 3d 452, 462 (S.D. Tex. 2021) ("This is so because a product 'cannot be unfit for ordinary use but unreasonably dangerous, nor can it be unreasonably dangerous but fit for ordinary use; it must be both or neither.") (*citing Smith v. Chrysler Grp., LLC*, 909 F.3d 744, 752 (5th Cir. 2018)); *Falk v. Nissan North Am., Inc.*, No. 17-cv-04871, 2018 WL 2234303, at *3 (N.D. Cal. May 16, 2018) (writing that the "minimum level of quality" included in the implied warranty of merchantability also "includes a basic level of safety") (citation omitted); *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1247 (D. Kan. 2007) (finding the plaintiffs sufficiently alleged an implied warranty of merchantability where they alleged the defendants' beverage products contained benzene, "which is a cognizable defect"); *see also* 3

34

renders a drug adulterated and illegal to sell, making it the definition of unmerchantable. 21 U.S.C. §§ 331(a), 351(a)(1), *see also* UCC § 2-314(2)(a).

Any action that violates the cGMPs also violates various states' consumer protection statutes, as failing to produce a drug product in accordance with minimum safety standards has been viewed as an unfair business practice. *See, e.g.*, *Barnes v. Unilever United States Inc.*, No. 21 C 6191, 2023 WL 2456385, at *3-4 (N.D. Ill. Mar. 11, 2023) (holding that cGMP violations could also for the basis of violations of the Illinois Consumer Fraud Act and California's Unfair Competition Law). This is particularly true in California and Illinois, where these states have adopted their own state-level "cGMP" prohibitions. *See* Cal. Health & Safety Code § 111260, 410 Ill. Comp. Stat. 620/14(a)(1). Accordingly, in these states, the cGMP has been adopted verbatim into state law, making these violations independently actionable.

Appellants' cGMP claims are not preempted as they seek to enforce

---

Anderson U.C.C. § 2-314:77, Content of implied warranty of merchantability — Safety (3d. ed.) ("The element of 'quality' within the implied warranty of 'merchantability' embraces the element of 'safety' for use. Thus, if a product is deemed unsafe due to some defect at the time of sale, there will be a breach of the implied warranty of merchantability.").

state law requirements that do not differ, in any manner, from federal requirements. *See* 21 U.S.C. § 379r(a); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 448 (2005) ("[A] state cause of action that seeks to enforce a federal requirement 'does not impose a requirement that is 'different from, or in addition to,' requirements under federal law.'"). Instead, these claims paralleled federal requirements, as allowed by section 379r. *Id.* This is likely why the vast majority of courts confronted with state law claims asserting violations of federal cGMP have concluded they are not preempted by the FDCA. *See, e.g.*, *McGee v. Johnson & Johnson*, 684 F.Supp.3d 371, 382-83 (W.D. Pa. 2023); *In re Chantix (Varenicline) Mktg.*, *Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F.Supp.3d 352, 388-89 (S.D.N.Y. 2024); *Bass v. Stryker Corp.*, 669 F.3d 501, 512-14 (5th Cir. 2012); *Santoro v. Endologix Inc.*, No. 3:19-cv-01679-YY, 2020 WL 6295077, at *5-6 (D. Or. Oct. 6, 2020); *Toubian v. Boston Scientific Corp.*, No. CV 14-2954-JFW, 2014 WL 12607702, at *4 (C.D. Cal. Aug. 14, 2014); *Knoppel v. St. Jude Medical, Inc.*, No. SACV 13-383, 2013 WL 12116393, at *3 (C.D. Cal. Sept. 24, 2013); *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 941 (8th Cir. 2011). What's more, several courts have concluded that the FDCA does not preempt state claims arising from cGMP violations

resulting in benzene contamination. *Barnes*, 2023 WL 2456385, at *5-6; *Williams v. Galderma Lab'ys, L.P.*, No. 24-CV-2222, 2024 WL 4213220, at *5 (N.D. Ill. Sept. 17, 2024); *Navarro v. Walgreens Boots All., Inc.*, No. 1:24-CV-00290-JLT-SAB, 2025 WL 1411406, at *13-14 (E.D. Cal. May 15, 2025); *Bodunde v. Walgreens Boots All., Inc.*, No. 1:24-CV-00985-JLT-SAB, 2025 WL 1411306, at *13-14 (E.D. Cal. May 15, 2025).

*Barnes v. Unilever United States Inc.*, is directly on point. In *Barnes*, plaintiff alleged that cGMP violations similar to those alleged here caused defendant's antiperspirants (also an OTC drug[11]) to become adulterated with benzene. *See generally Barnes*, 2023 WL 2456385. The *Barnes* court rejected defendant's preemption argument, which mirrored the reasoning of the court below in dismissing these Actions:

> Unilever contends that because the cGMPs do not mention benzene specifically, any enforcement of the FDA's guidance on benzene would "impose a manufacturing requirement on Unilever that is 'in addition to' or 'different from' federal requirements." … But Barnes alleges that Unilever failed to comply with cGMPs and that the presence of benzene "resulted from [Unilever]'s failure to comply with cGMPs." … Unilever does not contest that cGMPs are legally binding. *See* 21 C.F.R. § 330.1(a) (stating that any product not "manufactured in compliance with current good manufacturing practices" "is liable to regulatory action");

---

[11] *See* FDA OTC Monograph M019: Antiperspirant Drug Products for Over-the-Counter Human Use.

> *Bausch*, 630 F.3d at 555 (holding that "federal law is clear" that cGMPs applicable to medical devices "are legally binding requirements").

2023 WL 2456385, at *5-6. Put differently, a violation of the cGMP does not require finding that the drug was contaminated in a harmful manner, although this can certainly be a foreseeable result of such a violation. *See United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, an Article of Device,* 799 F. Supp. 1275, 1286 (D.P.R. 1992) ("This section of the Act forbids any and all filth, thus it is clear that the government need only prove the presence of filth.") (Citing *United States v. Cassaro, Inc.,* 443 F.2d 153, 156 (1st Cir. 1971) (noting that in a similar section of the FDCA regarding food adulteration, the court saw "no reason to read into the statute a requirement that the adulteration be proven injurious to health").

A similar result should follow here. The FDA itself has alerted "drug manufacturers to the risk of benzene contamination in certain drugs," stated that drug manufacturers "are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. §

211.84)… include[ing] testing of raw materials and finished product batches (21 C.F.R. § 211.165)." ER-695 (cleaned up). The FDA also has alerted drug manufacturers that certain ingredients can degrade into "benzene under certain conditions." ER-696. Thus, "increase in benzene content over a drug's shelf-life should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 C.F.R. §§ 211.165, 211.166), and establishment of an appropriate expiration date (21 C.F.R. § 211.137)." *Ibid* (cleaned up). And, of course, cGMP requires that drugs (as well as their constituent components) be manufactured and stored in appropriate facilities, which include temperature controls. 21 C.F.R. § 211.42.

These are the exact steps that Appellants allege that Appellees failed to take when manufacturing and holding the Acne Treatment Products. Appellants specifically allege that Appellees' failure to manufacture and store the Acne Treatment Products at the correct temperature is the primary violation of the cGMP (21 C.F.R. § 211.42), but this violation was compounded by Appellees' failure to do ingredient, finished product, and stability testing (*see, e.g.,* 21 C.F.R. §§ 211.84, 211.160, 211.165, 211.166, 211.137) that would have caught the benzene

contamination. ER-491-498, 785-792. Appellants further allege that as a result of Appellees' "marketing the Products as OTC drugs, Plaintiffs and other Class members reasonably assume that they meet minimum federal safety criteria and are manufactured in compliance with [FDA] requirements for such products." ER-473-74, 769-70; *Corbett v. PharmaCare U.S., Inc.,* 567 F.Supp.3d 1172, 1199 (S.D. Cal. 2021). Common sense supports an inference that consumers purchasing a purported legal OTC drug reasonably expect that it has been manufactured and stored in compliance with cGMP and if they purchase an OTC that is adulterated as the result of cGMP violations, they have been deceived to their detriment. Appellants are only attempting to hold Defendant to the very standard that the FDA notes require.

ii.    <u>Appellants' Reliance on the FDA's 2 ppm Guidance does not Render their Claims Preempted</u>

To the extent that Appellants rely on the FDA's 2 ppm guidance, it does not render Plaintiffs' claims preempted. *Barnes*, 2023 WL 2456385, at \*5-6. The District Court, in its opinion, seems to suggest that <u>*any amount of benzene*</u> is acceptable in the Acne Treatment Products, because there are no specific regulations setting limits on its use. ER-015 ("In sum, Plaintiffs have not plausibly alleged that the FDCA prohibits

Defendants from selling acne medications containing more than 2 ppm of benzene—let alone products that may degrade to contain more than 2 ppm of benzene during their shelf life.").  The District Court erred by ignoring the FDA's guidance (and the scientific consensus and international standards that the FDA's guidance stands on).[12]

Indeed, such guidance "may be probative of the lawfulness or unlawfulness of defendants' actions." *Reese v. Odwalla, Inc.*, No. 13-CV-00947-YGR, 2017 WL 565095, at *6 (N.D. Cal. Feb. 13, 2017); *Degelmann v. Advanced Med. Optics, Inc.*, 659 F.3d 835, 841 (9th Cir. 2011), *vacated upon voluntary dismissal* 699 F.3d 1103 (9th Cir. 2012) (holding that compliance with FDA Guidance was sufficient for defendant to establish preemption).  Plaintiffs may use "FDA guidance and warning letter to bolster their arguments" and to demonstrate that "plaintiffs' claims are in line with the FDA's current thinking and are thus not attempts to force

---

[12] The District Court suggested that Plaintiffs' counsel conceded, at oral argument, that absent the FDA's 2 ppm benzene limit, Plaintiffs case would fail.  ER-012-013.  Counsel's argument was more nuanced, noting that the 2 ppm benzene limit was "already recognized limit within the industry," thus "the warranty claims could still proceed because even if, say, there is no federal guidelines on what benzene levels are allowed." ER-036-037. Accordingly, Counsel argued that well their state law claims existed independent of, but paralleled, the FDA's 2 ppm benzene limit.

[Defendant] to do anything inconsistent or incompatible with [the FDCA]." *Gitson v. Trader Joe's Co.*, No. 13–cv–01333-WHO, 2013 WL 5513711, at *8 (N.D. Cal. Oct. 4, 2013); *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F.Supp.3d at 365-66 (non-binding FDA guidance informed Plaintiffs' cGMP allegations). This is particularly true here. The number of substances that could render a drug "adulterated" are too numerous to list in the relevant Monograph. Nor is an all-inclusive list of "adulterants" provided in the FDCA or its resulting regulations. Accordingly, the FDA guidance provides important context that cannot be ignored, especially when construing every reasonable inference in favor of the non-moving party.

The FDA is not the only relevant regulatory body to speak to the allowable benzene levels in pharmaceuticals. The USP is an industry reference drafted to assure standardization of pharmaceuticals by providing uniform specification limits for identity, quality, purity, and potency of drugs. Martin Blake, *The Role of the Compendia in Establishing Drug Standards*, 31 Food Drug Cosm. L.J. 276, 276 (1976). Given its importance in standardizing drug products, and the related goal of the FDCA in creating uniform, national drug standards, the USP

42

is incorporated into FDCA in a number of ways. First, the FDCA definition of "drug" specifically refers to and incorporates the standards set by the USP. 21 U.S.C. § 321(g)(1) ("The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them… ."). Second, and more significantly, failure to comply with the standards set forth in the USP can render a drug adulterated. 21 U.S.C. §§ 321(j) (the USP is a "official compendium" under the FDCA), 351(b) (a drug is deemed adulterated if "it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium…").

General Chapter 467 (Residual Solvents) of the USP adopts the standards within both the FDA and ICH guidelines, namely that benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of the unacceptable toxicities or deleterious environmental effects of these residual solvents" and sets a 2 ppm limit in drug products unless otherwise stated in the individual

monograph. *See* USP Chapter 467, available at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf (last visited Sept. 5, 2025). Thus, this standard becomes a statutory requirement under 21 U.S.C. § 351(b), which cannot be just hand waived away.

Surprisingly, the District Court held that the USP standard, as well as the FDA and ICH guidelines, are just not applicable. In its selective reading of the Q3C Tables and List, the District Court held that the 2 ppm limit only applies to products intentionally "manufactured" with benzene, not those with ingredients that degrade into benzene or that become contaminated with benzene unintentionally. ER-014. Thus, the District Court held that the 2 ppm limit cannot be applied to the Acne Treatment Products. *Ibid.* Yet this narrow reading of the Q3C Tables and List is at odds with its underlying purpose. The Q3C Tables and List specifically states that "[s]olvents in Class 1 ([such as benzene]) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect." ER-690 (the Q3C Tables and List state that the "[c]oncern" associated with benzene is it is a "[c]arcinogen"); *see also* ER-

44

685, 475-76, 773-74. The Q3C Tables and List also caution that "if [the use of benzene] is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified." ER-690. If benzene should not be used in the manufacture of drug, unless absolutely unavoidable, it should not be contained within the drug regardless of if its inclusion was intentional or not. There is simply no support for the contention the Q3C Tables and List provides that benzene can be added to drug product only at a maximum of 2 ppm, if sufficiently justified, but a drug can be contaminated with benzene at levels a hundred times higher than that amount if benzene was not part of the drug's formulation.

Benzene contamination is also covered by the FDCA's general prohibition against adulterated drugs. 21 U.S.C. § 331. A drug is adulterated "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance." 21 U.S.C. § 351(a)(1). As alleged in the Complaints, benzene is not meant to be in the Acne Treatment Products, but instead is a result of BPO degrading into benzene, due to improper temperature in storage and manufacturing. ER-482-84, 494-95, 778-80, 789-91. This type of "decomposition" falls well within the FDCA's general

45

definition "adulterated" drugs. 21 U.S.C. § 351(a)(1); *c.f. Cassaro, Inc.*, 443 F.2d at 156 (noting terms such "filthy" under the FDCA should be construed to have its usual and ordinary meaning); "Decompose," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/decompose, last accessed Sept. 8, 2025 (defining decomposed as "to separate into constituent parts or elements or into simpler compounds," *i.e.* "*decompose* water by electrolysis"); "Decompose," *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/decomposed, last accessed Sept. 8, 2025 ("to break, or to break something, into smaller parts," *i.e.* "Microbes decompose organic waste into a mixture of methane and carbon dioxide."). The amount of benzene in the Acne Treatment Products ranged in the hundreds or thousands of ppm during the Products' expected self-life *and* exceeded the 2 ppm at the time of sale. ER-487-88, 784. Whether the Acne Treatment Products are "decomposed" is not decided by application of some formula. Instead, a state of decomposition "depends upon so many contingencies" and "each case must be determined on its own facts." *A.O. Andersen & Co. v. United States*, 284 F. 542, 544 (9th Cir. 1922). This highly fact dependent question is not

suitable for determination on a motion to dismiss.

Contrary to the above authorities, the District Court held, without any citing any support, that Appellants could not rely on the "broad definition of adulteration in 21 U.S.C. § 351(a)." ER-014. As noted in a similar benzene contamination case, plaintiff did not have to point to "some other, *applicable*, federal requirement that renders an adulteration claim parallel to federal law." *Bojko v. Pierre Fabre USA Inc.*, No. 22 C 6728, 2023 WL 4204663, at *6 (N.D. Ill. June 27, 2023). Instead, reliance on the FDCA's general prohibition against drug products "contain[ing] a poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling" was enough. *Id.*

Indeed, this Court has already held that levels of benzene, even below 2 ppm, in a topical skincare product, could be considered unsafe. *See Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1147-48 (9th Cir. 2024) (relying on the same guidance cited here to determine that benzene, with even less than 2 ppm, may be unsafe). As this Court held, relying on the same ICH and FDA guidance discussed herein:

> The FDA is not stating, as Defendants argue and the district court held, that products containing less than 2 ppm of

47

benzene are safe, full stop. Characterizing such products as safe runs counter to the agency's caveat-laden guidance. Instead, the FDA has expressed the view that benzene should not be used in products unless its "use is unavoidable ... to produce a drug with a significant therapeutic advance" or "unless otherwise justified"; the FDA FAQ posted to the FDA's website suggests that "[d]rug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 parts per million (ppm)"; and that manufacturers "should contact FDA using the information provided in FDA's [A]lert if their testing reveals benzene in a product."

Accordingly, there is inconsistency even within the documents put forth by Defendants and relied upon by the district court: on the one hand, the FDA tells manufacturers not to *deliberately* put benzene in drugs unless it is "unavoidable" because of its "unacceptable toxicity;" on the other hand, the FDA advises manufacturers that if their drugs become *contaminated* with benzene, they should not release batches with more than 2 ppm benzene. Hardly a ringing endorsement for the proposition that products with less than 2 ppm benzene are "safe." The FDA guidance does not establish as a matter of law that sunscreen with benzene levels under 2 ppm is safe for human use.

*Id.*

While the *Bowen* decision focused on standing and not preemption, the Court's reasoning is equally applicable here. The decision below that as a matter of law, there is no level of benzene that would render the Acne Treatment Products adulterated under section 351(a)(1), despite the plethora of sources that suggest otherwise, was error.

48

Because the District Court wandered too far into the merits of the claims here, the foregoing discussion has been necessary. But the issue on appeal is preemption. Here, where the focus is on Appellants' state law claims based on cGMP violations, even viewed in the context of the FDA's 2 ppm guidance, Appellants are not seeking to enforce any requirements which depart from the FDCA. It is not necessary for this Court to decide the merits of Appellants' cGMP claims to conclude that they are not preempted. The District Court below erred in ruling otherwise.

### 2. *Appellants' Claims are not Impliedly Preempted*

While the decision below did not turn on implied preemption, for the sake of completeness, Appellants will address this issue. ER-012-015.

Here, *Davidson v. Sprout Foods, Inc.* is on point. *Id.,* 106 F.4th 842. While *Davidson* is involved in the interpretation of 21 U.S.C. § 343-1 (preempting state food labeling standards that are not "identical" to the requirements of the FDCA)— the preemption clause regarding food labels—the language and structure of that section is similar to 21 U.S.C. § 379r (preempting state OTC drug standards that are "different from or in addition to, or that is otherwise not identical with" the FDCA).

*Davidson* extensively examined Supreme Court and Ninth Circuit jurisprudence regarding FDCA preemption in medical device, drug, and food cases, holding that when state standards are identical to the federal standards, there can be no implied preemption because Congress specifically provided that the states could operate in this area. *See Davidson*, 106 F.4th at 848-49 ("There is no reason we can perceive why Congress would permit states to enact particular legislation and then deny enforcement by their citizens."); *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 808 (9th Cir. 2020) (While "[p]rivate plaintiffs may not bring actions to enforce violations of the FDCA…, private plaintiffs may bring analogous state law claims as long as the FDCA does not preempt those claims."); *see also Keams*, 39 F.3d at 225 ("[T]he Congressional narrowness and precision in preempting some state laws cuts against an inference of a Congressional intention to preempt laws with a broad brush, and without express reference."). This is true even when a case involves "state law negligence claim for violation of duties that paralleled duties owed under federal requirements." *Davidson*, 106 F.4th 849-50.

The cGMP claims here sound in traditional state law warranty claims. Essentially, Appellants allege that the Acne Treatment Products

50

are not of merchantable quality because they were negligently manufactured and stored, resulting in the Products becoming contaminated with unacceptable levels of a harmful carcinogen: benzene. And the 2 ppm benzene limit in pharmaceuticals is not just based on FDA guidelines, but nationally (such as the USP) and internationally (such as the ICH) recognized pharmaceutical guidelines, reflecting a scientific consensus regarding the toxicity of benzene recognized by nearly all major national and international health organizations. ER-474-82, 770-78. If the Acne Treatment Products are not passable under such widely accepted industry safety standards, they are not of merchantable quality. *Blue Cross Blue Shield Ass'n*, 417 F. Supp. 3d at 567. Nor are the Acne Treatment Products merchantable if they are not manufactured as required under federally established minimally sufficient manufacturing practices.

Appellants bring claims for Appellees' breaches of legal duties arising from state law that adopts "parallel duties owed under federal requirements." *Davidson*, 106 F.4th 849-50 ("There, citing *Lohr* and *Buckman*, we described the Supreme Court's preemption jurisprudence as establishing a rule that the FDCA 'does not preempt a state-law claim

for violating a state-law duty that parallels a federal-law duty" under the FDCA."") (*citing Stengel*, 704 F.3d at 1228-29). Accordingly, these cases do not involve the type of attempt to step into the regulatory shoes of the FDA or "fraud-on-the-FDA claims," which are traditionally found impliedly preempted the FDCA. *Id.* at 849 ("*Buckman* did not involve any violation of duties owed under a state consumer protection statute. Plaintiffs there were attempting to use causes of action available under state law to claim damages for violations of duties owed under the federal FDCA."); *Lefaivre*, 636 F.3d at 944 ("the present case is distinguishable from *Buckman* because Lefaivre's state-law claims are not fraud-on-the-FDA claims, as they "focus on [harm] that is allegedly perpetrated against [consumers] rather than the FDA."). Appellants' claims are not preempted, either expressly or impliedly, under the FDCA.

## VIII. CONCLUSION

For all the foregoing reasons, this Court should reverse the District Court's decision and vacate the judgment.


Dated: September 11, 2025      Respectfully submitted,

                                      */s/ Trenton R. Kashima*
                                      Trenton R. Kashima, Esq.
                                      BRYSON HARRIS SUCIU

& DEMAY PLLC
402 W. Broadway, Suite 1760
San Diego, CA 92101
(212) 946-9389
tkashima@brysonpllc.com

Lucy Inman. Esq.
BRYSON HARRIS SUCIU
& DEMAY PLLC
900 W. Morgan Street
Raleigh, NC 27603
(919) 275-2499
linman@brysonpllc.com

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants certify that the case number and name of each related case and its relationship to this case are: *O'Dea*, *et al.* v. *Alchemee, LLC & Taro Pharmaceutical USA, Inc.*, No. 25-3271, and *O'Dea & Heermann v. RB Health (US), LLC*, No. 25-3271, No. 25-3240, as both these cases involve similar facts, and the same underlying legal issues regarding FDCA preemption. Indeed, these matters have been consolidated for the purposes of briefing and oral argument. *See* Docket Entry No. 14.1 in No. 25-3240.

Dated: September 11, 2025        Respectfully submitted,

                                   /s/ *Trenton R. Kashima*
                                   Trenton R. Kashima, Esq.

## <u>CERTIFICATE OF COMPLI ACNE PURSUANT TO</u><br><u>FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32(a)(7)(C)</u>

I certify, pursuant to FED. R. APP. P. 32(a)(7)(C) and Circuit Rule 32(a)(7)(C), that the foregoing brief was prepared using Microsoft Word 365 and is proportionately spaced, has a typeface of 14 points, and contains 10,450 words.

Dated: September 11, 2025

Respectfully submitted,

/s/ *Trenton R. Kashima*
Trenton R. Kashima, Esq.

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on September 11, 2025, I electronically filed the foregoing with the Clerk of Court for the United State Court of Appeals for the Ninth Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 11, 2025          Respectfully submitted,

                                      /s/ *Trenton R. Kashima*
                                      Trenton R. Kashima, Esq.